**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**September 10, 2025**

# In the Court of Appeals of Georgia

A25A1083.  KINNAIRD  et  al  v.  MORNINGVIEW
    HOMEOWNERS ASSOCIATION, INC.

DILLARD, Presiding Judge.

Alex and Jean Kinnaird appeal from the trial court's grant of summary judgment for Morningview Homeowners Associations, Inc.[1] in their action for declaratory judgment related to an exterior modification they wished to make to their home. More precisely, the Kinnairds argue the trial court erred in (1) interpreting the neighborhood's Declaration of Protective Covenants; (2) failing to acknowledge the Kinnairds may bring a declaratory-judgment action; and (3) failing to determine

---

[1] For the sake of convenience, we refer to Morningview Homeowners Associations, Inc. as "the HOA" throughout this opinion.

whether the HOA's delegation of authority was procedurally fair and reasonable. For the following reasons, we reverse.

Viewed in the light most favorable to the Kinnairds as the non-moving parties,[2] the record shows they are longtime residents of the Morningview neighborhood in Suwanee. On May 22, 2022, the Kinnairds filled out and submitted an "Application for Modification," seeking to install 33 solar panels to the roof of their single-family home.[3] And within the application form, the Kinnairds gave the following explanation:

> The panels are REC's ultrapremium panels with 25 year product, labor, [and] solar output warranty. In [e]xistance since 1996[,] REC is one of the top two manufacturers of panels worldwide. Panels being installed are the ALPHA PURE 405 watt which are slimeline (sic) pure black panels.

---

[2] *See, e.g.*, *Villages of Cascade Homeowners Ass'n, Inc. v. Edwards*, 363 Ga. App. 307, 308 (870 SE2d 899) (2022) ("Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. In reviewing a trial court's ruling on a motion for summary judgment, we apply a de novo standard of review, and we view the evidence in a light most favorable to the nonmovant." (punctuation omitted)).

[3] *See generally* Edwin Kisiel, *Solar Panels in Condominium Communities*, 8 LSU J. ENERGY L. & RESOURCES 207, 210 (I) (2019) (noting that "commercially-available panels for rooftop installation can achieve up to 22% efficiency, with the cost per watt at just over $3.11" and that "[t]his has made solar panel technology much more affordable for the average homeowner").

Attached to the application was an aerial photograph of the Kinnairds' home with a rendering of where each of the 33 solar panels would be placed on the southeast and southwest portions of the roofline, so as to "avoid[ ] having panels fac[e] the street." They also included a three-paragraph explanation for why they were seeking to install the solar panels and the effort they made when selecting a contractor.

At 11:23 a.m. on May 23, 2022, the Kinnairds received (via email) a letter explaining their application had been received by the community manager and was forwarded to the HOA's Architectural Review Committee (the "ARC") for review to occur within 45 days. Then, *less than two hours later* at 1:06 p.m. that same day, the Kinnairds received a second emailed letter from the community manager, advising that their request had been denied. And in a portion denoted as "Reasons," the letter referred to Article 6, Section 23 of the neighborhood's Declaration of Protective Covenants concerning "Energy Conservation Equipment," which provides as follows:

> No solar energy collector panels or attendant hardware or other energy conservation equipment shall be constructed or installed unless they are an integral and harmonious part of the architectural design of a structure, as determined in the sole discretion of the ARC.

The letter also explained that the Kinnairds could submit an amended application or appeal the decision. But before taking further action, the Kinnairds reached out to a member of the ARC with the hope of discussing their request to install solar panels. In response, the member explained that "[s]olar panels are not currently approved by the bylaws," but noted that she would be happy to speak with them.

The Kinnairds ultimately appealed the ARC's decision to the HOA Board of Directors, but the Board affirmed the ARC's denial, which the community manager communicated to the Kinnairds on August 9, 2022. In response, the Kinnairds proposed discussing the ARC members' concerns in person, at which point the Kinnairds suggested they would introduce a modification and have an expert available to answer questions. But the ARC responded—through the community manager—that it would not meet with the Kinnairds, the Kinnairds' application had already been denied, and the Board had also denied the Kinnairds' appeal.

That October, the Kinnairds engaged an attorney who sent a letter to the community manager, explaining that because the ARC failed to execute its review duties as required by the community declarations, the request to add solar panels stood automatically approved under those same declarations. The letter also asserted

that—based on communications with the community manager and a member of the ARC—there was an underlying misunderstanding of what the Declaration of Protective Covenants did and did not prohibit with respect to the installation of solar panels. Additionally, the Kinnairds argued that any effective ban on the installation of solar panels violated public policy. Finally, the Kinnairds demanded the HOA permit the installation of their proposed solar panels.

Without a satisfactory response, on March 29, 2023, the Kinnairds filed an action for declaratory judgment, asking the trial court to declare the HOA's "announced ban and refusal to permit the installation of solar panels" unlawful and not in accordance with the Declaration of Protective Covenants; and to declare that the HOA failed to act in accordance with the Declaration of Protective Covenants, breaching a legal duty and giving rise to an explicit approval of the request for modification. The Kinnairds also brought claims for breach of contract, breach of a legal duty, and interference with property rights. They sought a mandatory injunction requiring the HOA to approve the requested modification and recover their reasonable attorney fees and expenses.

The HOA moved for summary judgment, which the trial court granted. In granting the motion, the court concluded the Kinnairds' application for modification contained information that could trigger the Declaration of Protective Covenant's indemnity provision and covenant not to bring suit based on the HOA's decision on such applications. This appeal follows.

1. The Kinnairds make several arguments about the trial court's interpretation of the Morningview Declaration of Protective Covenants. Restrictive covenants on real estate, like those at issue here, "run with the title to the land and are specialized contracts that inure to the benefit of all property owners affected."[4] As a result, the construction, interpretation, and legal effect of such an agreement is "an issue of law

---

[4] *Godley Park Homeowners Ass'n, Inc. v. Bowen*, 286 Ga. App. 21, 21 (649 SE2d 308) (2007) (punctuation omitted); *see Copelan v. Acree Oil Co.*, 249 Ga. 276, 277–78 (2) (290 SE2d 94) (1982) ("A covenant runs with the land when either the liability for its performance or the right to enforce it passes to the assignees of the land itself. In order that it may run with the land, its performance or nonperformance must affect the nature, quality, or value of the property demised, independent of collateral circumstances, or it must affect the mode of enjoyment, and there must be a privity between the contracting parties." (punctuation omitted)).

to which the appellate court applies the plain legal error standard of review."[5] And importantly, the usual rules of contract interpretation apply to restrictive covenants:

> First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity.[6] Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.[7]

On the issue of ambiguity, we must look to "the entirety of the agreement to determine the intent of the parties" because "it is axiomatic that contracts must be construed in their entirety and in a manner that permits all of the terms contained therein to be consistent with one another."[8] Furthermore, and significantly, because

---

[5] *Bowen*, 286 Ga. App. at 21; *see Goddard v. City of Albany*, 285 Ga. 882, 883 (1) (684 SE2d 635) (2009) (applying de novo review for plain legal error to issue of law).

[6] *See* OCGA § 13-2-2 (providing the rules of contract construction).

[7] *Langley v. MP Spring Lake, LLC*, 307 Ga. 321, 323 (834 SE2d 800) (2019) (punctuation omitted); *accord Freeman Cap. Grp., LLC v. Drury*, 367 Ga. App. 843, 847 (1) (887 SE2d 812) (2023).

[8] *Langley*, 307 Ga. at 324 (punctuation omitted); *accord Freeman Cap. Grp.*, 367 Ga. App. at 847 (1).

restrictions on private property are "generally not favored in Georgia, they will not be enlarged or extended by construction, and any doubt will be construed in favor of the [homeowner]."[9]

Turning to this case, the first relevant provision appears in Article VI ("Use Restrictions and Rules") of the Declaration of Protective Covenants. Section 3 of that article is entitled "Architectural Standards." The first three paragraphs of this four-paragraph section set forth, *inter alia*, procedural requirements for seeking to make changes to a neighborhood home's exterior. And as delineated in the first paragraph of Section 3, "[n]o exterior construction, addition, erection, or alteration shall be made unless and until plans and specifications showing at least the nature, kind, shape, height, materials, and location shall have been submitted in writing to and approved

---

[9] *Lake Arrowhead Prop. Owners Ass'n, Inc. v. Dalton*, 257 Ga. App. 655, 656 (1) (572 SE2d 25) (2002) (punctuation omitted); *see Pasha v. Battle Creek Homeowners Ass'n, Inc.*, 350 Ga. App. 433, 437 (829 SE2d 618) (2019) ("[I]f the intent of the parties cannot be discerned from the document as a whole, any ambiguity must be strictly construed in favor of the property owner, inasmuch as restrictions on private property are generally not favored in Georgia, and generally speaking, an owner of land has the right to use it for any lawful purpose." (punctuation omitted)). *See generally Bickford v. Yancey Dev. Co.*, 276 Ga. 814, 816 (3) (585 SE2d 78) (2003) ("The very purpose of restrictive covenants is to allow for uniformity in a given, planned development. In the area of real property law, rights and restrictions relating to covenants that run with the land must be certain and unequivocal.").

by an Architectural Review Committee ('ARC')." The next paragraph provides that "[i]f the ARC fails to approve or to disapprove submitted plans and specifications within sixty (60) days after the plans and specifications have been submitted to it, the foregoing will be deemed approved."[10] The third paragraph then explains that "[t]he ARC shall be the sole arbiter of such plans and may withhold approval for any reason, including purely aesthetic considerations, and it shall be entitled to stop any construction in violation of these restrictions."

The waiver-of-liability provision appears in the fourth and final paragraph of the section in bold, all capitalized letters, and provides, in relevant part:

> Plans and specifications are not approved for engineering or structural design or quality of materials, and by approving such plans and specifications[,] neither the ARC, the members thereof, nor the [HOA] assumes liability or responsibility therefor, nor for any defect in any structure constructed from such plans and specifications. Neither . . . the [HOA] [nor] the ARC . . . shall be liable in damages to anyone submitting plans and specifications to any of them for approval, or to any owner or property affected by these restrictions by reason of mistake in judgment, negligence, or nonfeasance arising out of or in connection with the

---

[10] This is the provision the Kinnairds relied on when asserting to the community manager that their request stood automatically approved.

approval or disapproval or failure to approve or disapprove any such plans or specifications.

Continuing on, the paragraph further provides:

Every person who submits plans or specifications and every owner agrees that such person or owner will not bring any action or suit against . . . the [HOA], [or] the ARC . . . to recover any damages and hereby releases, remises, quitclaims, and covenants not to sue for any claims, demands, and causes of action arising out of or in connection with any judgment, negligence, or nonfeasance and hereby waives the provisions of any law which provides that a general release does not extend to claims, demands, and causes of action not known at the time the release is given.

With these provisions in mind, we will turn now to each of the Kinnairds' contentions of error.

a. *Plans and Specifications.* The Kinnairds assert the trial court erred in concluding the information they provided with their application to the ARC constituted "plans and specifications." We disagree.

Section 3 of Article VI of the Morningview Declaration of Protective Covenant's requires that "[n]o exterior . . . *alteration* shall be made *unless and until* plans and specifications showing *at least the nature, kind, shape, height, materials, and*

*location* shall have been *submitted in writing*"[11] for approval by the ARC. And the Kinnairds' submission seeking permission to alter the exterior of their home reflected the nature of the requested installation (solar panels), the number of panels (33), the kind/materials/height (REC's ALPHA PURE 405 watt slimline), and the color of those materials (black). And on the aerial rendering submitted, the ARC could see the shape of the panels (rectangular) and location for installation (which was also described in the application form as the southwest and southeast slopes of the Kinnairds' roof, out of street view).

Without submitting this information, the Kinnairds would have been unable to receive either approval or disapproval from the ARC for the requested alteration. And the information they submitted conforms with the "plans and specifications" required for the ARC to perform its review, which the Declarations specify may be conducted by the ARC members or by "architects, engineers, or other persons" deemed necessary to "enable the ARC to perform its review." As a result, the trial court did not err in concluding the Kinnairds submitted plans and specifications as contemplated by Article 3 of Section VI.

---

[11] (Emphasis supplied).

b. *The Waiver of Liability.* Next, the Kinnairds argue the trial court erred in its interpretation of Section 3's waiver-of-liability provision when it construed the provision to bar their action against the HOA. On this point, we agree.

Once again, the first relevant provision—which is in the fourth and final paragraph of Section 3 and placed in bold, all-capitalized letters—warns that

> [n]either . . . the [HOA] [nor] the ARC . . . shall be liable in damages to anyone submitting plans and specifications to any of them for approval, or to any owner or property affected by these restrictions by reason of mistake in judgment, negligence, or nonfeasance arising out of or in connection with the approval or disapproval or failure to approve or disapprove any such plans or specifications.

It continues by further specifying that

> [e]very person who submits plans or specifications and every owner agrees that such person or owner will not bring any action or suit against . . . the [HOA] [or] the ARC . . . to recover any damages and hereby releases, remises, quitclaims, and covenants not to sue for any claims, demands, and causes of action arising out of or in connection with any judgment, negligence, or nonfeasance and hereby waives the provisions of any law which provides that a general release does not extend to claims, demands, and causes of action not known at the time the release is given.

The trial court, like the HOA, interpreted these provisions as applying to the approval or denial of plans or specifications *across the board*. And perhaps that might be a plausible interpretation if the clauses were read in isolation. But when read with the remainder of Section 3, as they must be, the more narrow application of these two provisions becomes evident.[12]

The first sentence of the waiver-of-liability provision is instructive. It provides that "[p]lans and specifications *are not approved for engineering or structural design or quality of materials*, and by approving such plans and specifications[,] *neither the ARC, the members thereof, nor the [HOA] assumes liability or responsibility therefor, nor for any defect in any structure constructed from such plans and specifications.*"[13] In other words, this portion of Section 3 makes clear that the HOA or ARC's approval of any plans or

---

[12] *See Brazeal v. Newpoint Media Grp., LLC*, 331 Ga. App. 49, 56 (769 SE2d 763) (2015) ("A word or phrase in a contract cannot be considered in the abstract or in a vacuum, but instead must be gauged by the words that surround it."); *Sheridan v. Crown Cap. Corp.*, 251 Ga. App. 314, 317 (1) (554 SE2d 296) (2001) ("[T]he contract must be construed as a whole rather than in separate and distinct parts, giving effect to all terms; the contract should not be determined by examining isolated clauses and provisions . . . ."); *see also* OCGA § 13-2-2 (4) ("The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part[.]"); *Tidwell v. Carroll Builders, Inc.*, 251 Ga. 415, 418 (3) (306 SE2d 279) (1983) (same).

[13] (Emphasis supplied).

specifications is not a warranty as to their quality or safety. And to that end, reading the remaining sentences of this portion of the section, the HOA, ARC, and other named entities are not liable for defects that may result from a bad design or poor-quality materials, or defects "in any structure constructed from such plans and specifications." Suffice it to say, this is decidedly *not* the same thing as insulating the HOA or ARC from liability for *all* situations involving approval or disapproval of requested modifications.

As to the covenant "not to sue," it directly follows this narrow waiver of liability, meaning property owners and persons who "submit plans or specifications" agree they will not pursue the HOA or ARC for the types of claims previously mentioned. Put another way, owners and applicants seeking to make a modification agree not to sue based on any damages arising as a result of the engineering plans, structural design, or quality of materials ultimately used by reason of the approval or disapproval of the request. So, for instance, if the ARC or HOA had approved the Kinnairds' request to install the specific solar panels mentioned in their submitted "plans and specifications," the HOA and ARC would not be liable to the Kinnairds if those solar panels were of poor quality, defective, failed to collect enough energy at

the approved location, or somehow resulted in other damage. And so, the Kinnairds—under the plain terms of the Declarations—would be unable to sue the HOA and ARC for those same reasons. But that is *not* the type of lawsuit the Kinnairds filed. Indeed, the Kinnairds challenge and seek to recover damages based on how the HOA and ARC did or did not execute their duties in the approval/disapproval process.

Given the more narrow applicability of these two provisions, the Kinnairds' action for breach of contract, breach of legal duty, interference with property rights, and bad faith under OCGA § 13-6-11 is not barred. And because the trial court erred in its broad, erroneous interpretation of these provisions, its grant of summary judgment for the HOA is reversed.[14]

2. Next, the Kinnairds contend the trial court erred by failing to acknowledge that they may bring a declaratory-judgment action under the Declaration of Protective Covenants, but we have no jurisdiction to consider this claim because the trial court

---

[14] We need not address the Kinnairds' separate contention that the indemnity provision is void and unenforceable under OCGA § 13-8-2 (b).

did not explicitly *rule* on this question.[15] Even so, given our reversal of the court's grant of summary judgment in Division 1, the Kinnairds' action for declaratory judgment survives.

3. Finally, the Kinnairds assert the trial court erred in failing to determine whether the HOA's delegation of authority was "procedurally fair and reasonable," and whether the ARC's substantive decisions of denial "were made in good faith, were reasonable, and were not arbitrary and capricious." But this enumeration essentially argues the merits of the Kinnairds' claims, which the trial court did not consider.[16] So, to the extent the Kinnairds raise an issue not ruled on by the trial

[15] *See Ga. Neurology & Rehab., P.C. v. Hiller*, 310 Ga. App. 202, 204 n.2 (712 SE2d 611) (2011) ("[W]e have no jurisdiction to address the claim because the trial court never ruled upon it in its summary judgment order."); *see also Shelley v. Town of Tyrone*, 302 Ga. 297, 308 (3) (806 SE2d 535) (2017) (noting that "an appellant may not on appeal raise questions or issues neither raised or ruled upon by the trial court" (punctuation omitted)); *Brazeal v. Newpoint Media Grp., LLC*, 331 Ga. App. 49, 53 n.2 (769 SE2d 763) (2015) ("Because there has been no ruling on the implied covenant claim by the trial court, any issues relating to that claim are not ripe for appellate review.").

[16] *See Saunders v. Thorn Woode P'ship L.P.*, 265 Ga. 703, 704 (2) (462 S2d 135) (1995) ("Where, as here, the declaration delegates decision-making authority to a group and that group acts, the only judicial issues are whether the exercise of that authority was procedurally fair and reasonable, and whether the substantive decision was made in good faith, and is reasonable and not arbitrary and capricious."); *Salter v. St. Charles Homeowners Ass'n, Inc.*, 368 Ga. App. 504, 508 (2) (890 SE2d 391)

court—which granted summary judgment for the HOA based solely on the indemnity provision and covenant not to sue—this enumeration presents nothing for our review.[17]

That said, this enumeration is *not* specifically directed at the trial court's conclusion that the Kinnairds failed to present evidence of bad faith as to their claim for attorney fees under OCGA § 13-6-11. But before this ruling, the trial court had already determined that *all* of the Kinnairds' claims—including for recovery under OCGA § 13-6-11—were barred by the indemnity provision and covenant not to sue, which we have reversed. And again, the court did not consider the merits of the Kinnairds' underlying claims, which could give rise to recovery under OCGA § 13-6-

(2023) ("When reviewing a homeowners association's decisions, the only judicial issues are whether the exercise of that authority was procedurally fair and reasonable, and whether the substantive decision was made in good faith, and is reasonable and not arbitrary and capricious." (punctuation omitted)).

[17] *See Hiller*, 310 Ga. App. at 205 n.2 ("[W]e have no jurisdiction to address the claim because the trial court never ruled upon it in its summary judgment order."); *see also Shelley*, 302 Ga. at 308 (3) (noting that "an appellant may not on appeal raise questions or issues neither raised or ruled upon by the trial court" (punctuation omitted)); *Brazeal*, 331 Ga. App. at 53. n.2 ("Because there has been no ruling on the implied covenant claim by the trial court, any issues relating to that claim are not ripe for appellate review.").

11.[18] So, lest there be any doubt, the ruling as to recovery under OCGA § 13-6-11 is likewise reversed.

For all these reasons, we reverse the trial court's grant of summary judgment for the HOA.

*Judgment reversed. Mercier, J., and Senior Judge C. Andrew Fuller, concur.*

---

[18] *See* OCGA § 13-6-11 ("The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them."); *Taylor v. Devereux Found., Inc.*, 316 Ga. 44, 89 (VII) (885 SE2d 671) (2023) ("Bad faith warranting an award of attorney fees must be based on conduct during the transaction out of which the lawsuit arose." (punctuation omitted)); *Foxchase, LLLP v. Cliatt*, 254 Ga. App. 239, 240 (2) (562 SE2d 221) (2002) ("Bad faith warranting an award of attorney fees must arise out of the transaction on which the cause of action is predicated, and it may be found in how the defendant acted in his dealing with the plaintiff.").